IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF IOWA

| | |
|---|---|
| IN RE: ) | |
| ) | Chapter 12 |
| GROOTERS FEEDLOT, LLC, ) | |
| ) | Bankruptcy No. 18-00356 |
| Debtor. ) | |

**RULING ON MOTION FOR PERMANENT USE OF CASH COLLATERAL**

This matter came on for hearing on April 24, 2017 in Sioux City, Iowa. Don Molstad appeared for Debtor Grooters Feedlot, LLC ("Debtor"). Sander Moorhead appeared for Peoples Bank ("the Bank"). The Court received evidence and heard argument. This is a core proceeding under 28 U.S.C. § 157(b)(2)(M).

**STATEMENT OF THE CASE**

Debtor is a commercial cattle feedlot. Debtor bills its customers, the owners of the cattle, for yardage and feed and other expenses each month. Included in that bill is cost of feed for the livestock, which the cattle owners pay. Debtor argues the money the owners pay is specially earmarked to pay the grain elevators for feed they supply. Debtor claims these funds are not the Bank's cash collateral. The Bank argues that the funds are the Bank's cash collateral and Debtor's argument that the funds should go to the elevator is an earmarking argument that does not apply here. Debtor argues that even if the money is cash collateral, the Bank is adequately protected by being oversecured. The Bank disagrees. The

Bank also argues no cash collateral use should be authorized because Debtor's plan is not feasible.

## BACKGROUND, ARGUMENTS, AND FINDINGS OF FACT

Debtor is a business that houses and feeds livestock. Debtor charges customers—the owners of the livestock—per head per day ("yardage"), plus feed and any veterinary or other livestock care expenses. This arrangement is supposed to generate income for Debtor without the risk of owning the livestock. Debtor also grows corn and soybeans on over 500 acres of rented ground. Debtor uses the crops as a source of feed that provides revenue to its operation.

Cattle feeding contracts are typically oral, 30-day handshake agreements. Under the contracts, Debtor houses, feeds, gives shots, provides bedding, and does other tasks to care of the cattle. Debtor has a vet and nutritionist to assist in housing and feeding the cattle. Debtor pays the feed elevator (or other feed suppliers) for the feed. It then bills the customer for the feed. There is usually a month between when Debtor pays for feed and when Debtor is reimbursed for the feed from the customer. The payments Debtor receives from the livestock owners is fundamental to Debtor's operation succeeding. Those payments are in turn paid over to the grain elevators supplying the feed. If this arrangement was altered to affect Debtor's ability to pay feed suppliers, no feed would get delivered and Debtor could not operate.

The grain elevator typically delivers feed to Debtor, which keeps track of how many pounds of feed it puts into the feed bunks for its customers' livestock in each pen. This feed amount is then billed out to the customer based on the weight of feed provided to their livestock. The payments Debtor receives for the feed are then paid over to the elevators supplying the feed to ensure they will continue to deliver. Some customers provide their own feed for their cattle and, if so, Debtor does not bill for this feed. This method of operation is standard for the industry.

Debtor has had financial trouble in recent years. Four years ago, a landowner the Debtor rented cropland from died and Debtor lost access to about 300 acres for growing crops. This reduced Debtor's ability to supply its own feed for the cattle at the feedlot. Two years ago, Debtor was feeding Holstein cattle, and lost money when the market for those cattle went bad. Debtor was virtually unable to sell the Holstein cattle because there was no demand for them. There has been much uncertainty in the cattle market in general over the last few years.

In the last six months, the cattle market has been particularly difficult. Debtor's customers have not been acquiring and housing more cattle because of the down market and uncertain future. This has led to Debtor having fewer head of cattle in its feedlot.

Debtor filed bankruptcy on March 23, 2018. Debtor owes the Bank about $2.3 million. The Bank holds a blanket security interest in Debtor's assets. Debtor

listed the value of the assets subject to the Bank's security interest as $2.7 million. Debtor sought permission to use the Bank's cash collateral to continue its operation. Debtor and the Bank entered into a temporary cash collateral agreement. Debtor now seeks a permanent cash collateral order. In order to facilitate Debtor's operation pending ruling on the motion for permanent cash collateral, the Court has extended the temporary cash collateral until May 1, 2018.

Debtor seeks to use feed payments from farmers to Debtor to pay several elevators and other suppliers a total of $165,221.52. Debtor proposes paying the Bank any funds it receives for silage or grain sold out of its existing inventory. Debtor also proposes paying the Bank $7,000 per month as adequate protection for Debtor using the money as proposed.

Debtor has checks on hand from customers totaling $190,440.43. Debtor has March billings of $43,445.06.

Debtor first argues that the portion of these checks on hand that is for feed is essentially money set aside to pay the elevators that supplied the grain. Debtor argues that it is not the Bank's cash collateral. Debtor argues instead that this money is specially designated for the grain elevators who provided the feed. Debtor concludes that it can use portions of these checks that represent feed payments to pay grain elevators without getting the Bank's permission, because it is not the Bank's collateral.

The Bank argues that the funds in question are its cash collateral and Debtor has not shown, and cannot show, that it can adequately protect the Bank. The Bank argues that Debtor has not provided information about the value of the Bank's interest, the risk to its interest, and whether the $7,000 monthly payment is sufficient to compensate it for that risk.

David Grooter, who owns and operates Debtor, lives in a residence at the feedlot in Sanborn, Iowa. He has had the feedlot since 2003. His grandparents owned the farm that the feedlot is on starting in 1972. Mr. Grooter's testified about the feedlot, its operation, and the plans for the case moving forward.

Kenneth Murphy, Debtor's CPA, also testified. Debtor is a longtime client of Mr. Murphy. Mr. Murphy has prepared tax returns and performed other financial services for Debtor over the years. He also farms and understands agricultural product pricing and practices. He recently provided a cash flow for the Debtor and attempted to determine future feasibility of Debtor's operation.

Mr. Murphy prepared a summary of Debtor's anticipated cash flow. It shows the estimated yields of Debtor's corn and soybean crops. Debtor's cash flow assumes conservative yields based on yield history. In addition, Debtor sells and uses manure that comes off the cow yard as fertilizer. This also produces income. Debtor's yardage income assumes 1,100 head of cattle inside the barn, and about 600 on lots outside. Finally, Debtor's government payment last year

was $12,000 or $13,000. This amount is based on 5-year historical yield and price average of production in the region. The expenses are based on 2017 costs. The cash flow anticipates $219,795 in net income at the end of the year.

This cash flow relies on Debtor obtaining yardage payments of $6,000 per month—$72,000 annually—above what Debtor has been receiving historically. In addition, the cash flow assumes $140,000 in crop income. Taken together, these two amounts equal a little over $212,000. This is the amount of Debtor's anticipated net income set out in its cash flow. In other words, Debtor must increase its yardage above what it has had over the past 6 months and must plant crops as planned in order to meet its cash flow.

Debtor does not, however, own ground to raise crops. Debtor rents ground. Rent was due on March 31, but Debtor has not yet paid. Debtor still has not obtained financing for the rent. Debtor admits that if it cannot get financing its cash flow and plan will not work. Debtor has approached two lenders for financing. Debtor has the seed and input financed but is waiting on the rent.

Debtor is optimistic about receiving financing for rent from Cooperative Credit. Cooperative Credit works with local agricultural elevators and coops to provide financing to agricultural businesses. If the local elevator will back the note, farmers usually can get financing through Cooperative Credit. Here, Debtor has the option to seek financing from Cooperative Credit only if Debtor pays a bill

currently due to the elevator that could back its loan. The outstanding bill is for $30,000. The elevator is not willing to go to Cooperative Credit with Debtor until this bill is paid.

Debtor has eight or nine outside dirt lots with cement feed bunks. In 2007, Debtor erected a building that can house 1,400 head of cattle. There are eleven pens inside this building. The outside lots will hold 1,200 head, but whether they get filled depends on the weather conditions—mainly rain. Cattle housed outside are billed at $0.28 per day per head. The cattle housed inside are billed at $0.32–$0.34 per day per head deepening on type.

Right now, Debtor has 1,000 head inside the building. Debtor has 440 head outside. Debtor has two or three other customers who are looking to buy cattle and place them with Debtor. Those potential customers are looking to bring about 400–500 head onto Debtor's lots.

Before the bankruptcy, Debtor had not made a payment to the Bank for two years. After filing bankruptcy, Debtor made some payments through the help of Mr. Grooter's mother-in-law. She has personally guaranteed $500,000 of Debtor's debt. Mr. Grooter's mother-in- law had a farm she was going to sell and put the funds into the corporation. As originally planned, however, there were going to be adverse tax consequences of this sale—so the deal changed. Mr. Grooter's parents, who also had personally guaranteed $500,000 of the debt, sold 49 acres they

owned next to the feedlot to Mr. Grooter's mother-in-law for $568,000. This sale money went to the Bank.

As part of the proposed plan of reorganization here, Mr. Grooter's mother-in-law will sell a farm she owns for about $500,000. That money will go to pay the Bank. This sale has not yet happened, but the property is listed with a realtor. If that money comes in as planned, and pays down Debtor's debt with the Bank, Debtor can cut debt service payments to the Bank on equipment in half. If this all occurs, Mr. Grooter's mother-in-law will have invested over $1 million in Debtor's operation. There is no agreement for Debtor's repayment of that debt.

## CONCLUSIONS OF LAW AND ANALYSIS

A debtor-in-possession may not use cash collateral unless the secured creditor consents or the court authorizes the use of the cash collateral. 11 U.S.C. § 363(c)(2). On request of a party with an interest in cash collateral, the court must prohibit or condition a debtor's use of cash collateral "as is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e). Adequate protection may be cash payments, replacement liens, or relief that "will result in the realization by such entity of the indubitable equivalent." 11 U.S.C. § 361.

> In order to encourage reorganization, the courts must be flexible in applying the adequate protection standard. This flexibility, however, must not operate to the detriment of the secured creditor's interest. In any given case, the bankruptcy court must necessarily (1) establish the value of the secured creditor's interest, (2) identify the risks to the secured creditor's value resulting from the debtor's request for use of

cash collateral, and (3) determine whether the debtor's adequate protection proposal protects value as nearly as possible against risks to that value consistent with the concept of indubitable equivalence.

Martin v. United States (In re Martin), 761 F.2d 472, 476–77 (8th Cir. 1985).

In the context of an oversecured creditor, the creditor's "equity cushion is entitled to adequate protection to the extent reasonably necessary to assure that upon default the secured creditor will realize collateral value in the amount of its unpaid secured claim." In re Richards, No. 03-02487, 2004 WL 764526, at *4 (Bankr. N.D. Iowa Apr. 2, 2004). Thus, the interest that must be adequately protected is the "the decline in the value of the collateral only, [not] the ratio of the collateral to the debt." Id. ("A decline in the amount of an equity cushion is not equivalent to denial of adequate protection of a secured claim.").

In weighing a creditor's interest in maintaining its equity cushion against a debtor's "need for some trimming of usual creditor rights during the reorganizational process," this Court has said: "The oversecured creditor which, outside bankruptcy, may be able to foreclose prior to erosion of the equity cushion is required to make some sacrifice in a bankruptcy case so that all interests may benefit from a successful reorganization." Id. at *4 (internal quotation marks omitted).

The first question raised is whether the money and checks Debtor now holds are even the Bank's cash collateral. Debtor claims those funds are segregated,

9

earmarked, or otherwise specially designated to pay feed suppliers. The Bank argues these funds are covered as its cash collateral, and the arguments on earmarking are not applicable here.

The Court need not resolve this issue because it finds the second issue—adequate protection—to be dispositive on this particular cash collateral question.

Here, Debtor's schedules show assets valued at $2.7 million. This value was reasserted at the hearing and not substantially challenged by the Bank. The Bank has a claim of $2.3 million. Although some of these assets (like Debtor's cooperative stock) may be subject to a prior security interest or setoff, no evidence was offered suggesting that these assets add up to any value close to $400,000. The Court concludes, on this record, that the Bank is oversecured by at least $300,000. The Court finds no substantial risk that the Bank's collateral's value will drop significantly and no evidence that the Bank's equity cushion would be in jeopardy for the limited duration of this cash collateral order. In fact, the amount that Debtor requests is less than the equity cushion. The Court also finds that Debtor's proposed $7,000 monthly payment to ensure the Bank is adequately protected compensates the Bank for this reduction of its equity position by Debtor's use of cash collateral. Debtor has also proposed additional revenue for the Bank in the way of silage and corn crop sales, and a $500,000 payment from

Mr. Grooter's mother-in-law. Those payment sources provide additional protection for the Bank.

Much of the evidence and testimony at the hearing addressed Debtor's operational feasibility over the next year and ability to confirm a plan in this case. There are certainly questions about feasibility in this case. Debtor's ability to confirm its plan relies on many "ifs." In particular, those "ifs" are whether Debtor can obtain financing to make its rent and plant crops this spring, whether Debtor can obtain additional customers and head of cattle, and whether Debtor's guarantor will, in fact, be able to sell her farm and make the proposed $500,000 payment. These are serious uncertainties that could make it difficult for Debtor to move forward and confirm a plan in this case. Nevertheless, they are not, on this record, fatal to Debtor's request to use cash collateral at this early point in the case. On this record, the Court finds that the Bank is oversecured and that Debtor's proposed adequate protection payment (and potentially other additional revenue) compensates the Bank for the risk in using its cash collateral.

In reaching this conclusion, the Court also has factored in the unrefuted testimony that Debtor will have a more accurate picture of its ability to reorganize very soon. Either Debtor will get financing for cropland rent within the next month, or it won't. The ability to use cash collateral to pay the elevator, however,

improves Debtor's chances of obtaining rent financing and of making a successful attempt at reorganization.

Similarly, Debtor's guarantor's farm is already on the market. It could be sold and the proceeds paid to the Bank very soon. That would significantly reduce the Bank's claim and allow Debtor some breathing room in its payments. Finally, Mr. Grooters testified that Debtor is able to house more cattle in outdoor pens during the summer months, which are just ahead. These facts show that, with a little more time, Debtor may be in a much better position. The risk to the Bank during this time is minimal given its equity position. Debtor's proposed payments adequately compensate the Bank for any risk that this passage of time will cause.

Without cash collateral, Debtor will be unable to pursue a potentially promising source of financing. The Court is reluctant to foreclose reorganization at this early stage where there is a possibility of success and minimal risk to the Bank's secured claim. The Court will allow Debtor the opportunity to see these possibilities through but notes that whether Debtor is successful in these near-term opportunities will be relevant to the Bank's pending motion for relief from stay. "In order to encourage reorganization," In re Martin, 761 F.2d at 476, the Court considers these facts and authorizes Debtor's use of cash collateral conditioned on payments as outlined in Debtor's motion.

The Court will, however, limit the duration of the cash collateral order to 45 days. The feasibility issues should be cleared up during that time. The 45-day period limits the Bank's exposure to a decrease in asset value. If the 45-day period expires without a plan confirmation or further agreement of the parties, the Debtor must again apply for and get court approval of additional cash collateral. The Bank's pending motion for relief from stay will provide another check-in on these feasibility issues moving forward.

## CONCLUSION

**WHEREFORE**, Debtor's Motion for Permanent Use of Cash Collateral and Pay Certain Necessary Vendors is GRANTED IN PART for 45-days from the date of this order.

Dated and Entered:

May 1, 2018

_____
Thad J. Collins
Chief Bankruptcy Judge